**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: TYLENOL (ACETAMINOPHEN) MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | § **MDL NO. 2436**<br>§<br>§<br>§ **2:13-md-02436**<br>§<br>§ **HON. LAWRENCE F. STENGEL** |

This Document Relates to:

Civil Action No. 2:12-cv-07263

Rana Terry, as Personal Representative
and Administrator of the Estate of Denice
Hayes, Deceased,

Plaintiff,

vs.

McNEIL-PPC, Inc., McNeil Consumer
Healthcare, and Johnson & Johnson, Inc.,

Defendants.

**M E M O R A N D U M**

Stengel, J.                                                    July 28, 2016

This case is part of a Multidistrict Litigation (MDL) involving claims of liver

damage from the use of Tylenol at or just above the recommended dosage.[1] This is the

---

[1] See Master Compl., 13-md-2436, Doc. No. 32. There are over two hundred other cases included in this MDL, along with several similar cases in New Jersey state court.

first "bellwether" case scheduled for trial.[2] The plaintiff plans to offer Dr. Robert Nelson as a general causation, regulatory, and pharmacovigilance expert. The defendants move to exclude parts of his testimony under <u>Daubert</u>. For the reasons stated below, I will deny their motion.[3]

## I.    LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703 as well as by <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), and its progeny.[4] <u>See</u> <u>In re Paoli RR Yard PCB Litigation (Paoli II)</u>, 35 F.3d 717, 735 (3d Cir. 1994). "Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 243 (3d Cir. 2008)(quoting <u>Kannankeril v. Terminix Int'l, Inc.</u>, 128 F.3d 802, 806 (3d Cir. 1997)). The Third Circuit recognizes a "liberal policy of admissibility" regarding Rule 702. <u>Pineda</u>, 520 F.3d at 243 (quoting <u>Kannankeril</u>, 128 F.3d at 806); <u>United States v. Schiff</u>, 602 F.3d 152, 173 (3d Cir. 2010).[5]

---

[2] A "bellwether" case is a test case. "Bellwether" trials should produce representative verdicts and settlements. The parties can use these verdicts and settlements to gauge the strength of the common MDL claims to determine if a global resolution of the MDL is possible. <u>See</u> FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION, FOURTH EDITION 360 (2004); DUKE LAW CENTER FOR JUDICIAL STUDIES, MDL STANDARDS AND BEST PRACTICES 16-21 (2014).

[3] In making my decision, I have reviewed all of the materials submitted as attachments to the parties' briefs, including those submitted during oral argument.

[4] <u>Daubert</u> held that the Federal Rules of Evidence, specifically Rule 702, controlled the issue of when experts were qualified. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 587-88 (1993). It found that Rule 702 superseded the Court's prior precedent on the subject found in <u>Frye v. United States</u>, 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923). <u>Id.</u> at 587. <u>Daubert</u> went on to clarify what was required under Rule 702, as compared to <u>Frye</u>. <u>See id.</u> at 589-598.

[5] <u>See also</u> <u>Holbrook v. Lykes Brothers Steamship Company, Inc.</u>, 80 F.3d 777, 780 (3d Cir. 1996); <u>Zaprala v. USI Servs. Gp., Inc.</u>, No. 09–1238, 2013 WL 1148335, at *6 (E.D. Pa. Mar. 20, 2013)(quoting <u>Pineda</u>, 520 F.3d at 243).

"[B]ecause expert evidence is often more misleading than other evidence, Rule 403 gives a judge more power over experts than over lay witnesses." In re Paoli RR Yard PCB Litigation (Paoli II), 35 F.3d 717, 747 (3d Cir. 1994). However, "in order for a district court to exclude scientific evidence, there must be something particularly confusing about the scientific evidence at issue— something other than the general complexity of scientific evidence." Id.

### a.  Rule 702

Federal Rule of Evidence 702 has three major requirements: 1) the expert must be qualified; 2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and 3) the testimony must assist the trier of fact.[6] Pineda, 520 F.3d at 243 (citing Kannankeril, 128 F.3d at 806). 702's inquiry should be a "flexible one." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 594 (1993).

### i.     Expert Must Be Qualified

An expert's qualifications may include education, provided it is in a field related to the one in which the expert intends to testify. Fedor v. Freightliner, Inc.,

---

[6] Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

193 F. Supp. 2d 820, 827 (E.D. Pa. 2002). Overall, the court will consider both academic training and practical experience to determine if the expert has "more knowledge than the average lay person" on the subject. Id. at 827-28 (citing Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998)). "An expert may be generally qualified but may lack qualifications to testify outside his area of expertise." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 322 (3d Cir. 2003).

However, this does not mean that the "best qualified" expert must testify. "[W]itnesses may be competent to testify as experts even though they may not, in the court's eyes, be the 'best' qualified." Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 782 (3d Cir. 1995).[7] "Rule 702 and Daubert put their faith in an adversary system designed to expose flawed expertise." U.S. v. Mitchell, 365 F.3d 215, 244-45 (3d Cir. 2004)(citations omitted). "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross–examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Id. at 244 (citations omitted).

### ii.    Expert's Methods Must be Reliable

This Circuit interprets the second factor as one of "reliability," i.e., the testimony is admissible so long as the process or technique the expert used in formulating the

---

[7] See also Keller v. Feasterville Family Health Care, 557 F. Supp. 2d 671, 675 (E.D. Pa. 2008)(Rice, J.).

opinion is reliable. <u>Pineda</u>, 520 F.3d at 244. An expert's opinion need not be correct, only reliable. <u>See</u> <u>In re Paoli RR Yard PCB Litigation (Paoli II)</u>, 35 F.3d 717, 744 (3d Cir. 1994)("This does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." (emphasis in original)). "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." <u>Daubert</u>, 509 U.S. at 592.  "[I]t is the burden of the party offering the expert scientific testimony to demonstrate reliability by a preponderance of the evidence." <u>In re TMI Litig.</u>, 193 F.3d 613, 705 (3d Cir. 1999)(citing <u>Paoli II</u>, 35 F.3d at 744).[8]

"Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 158 (1999). Judges considering this factor should look to whether a theory, technique, or opinion can be tested or has been subject to peer review or publication. <u>Daubert</u>, 509 U.S. at 593. "The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." <u>Id.</u> at 594. A court should also consider the known or potential rate of error involved in a scientific method. <u>Id.</u>

---

[8] <u>See also</u> Fed. R. Evid. 702, Advisory Committee Note (2000 Amendments)("Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." (citing <u>Bourjaily v. United States</u>, 483 U.S. 171 (1987)).

"Reliability" does not require that a technique or methodology be generally accepted by a scientific community. Id. See also id. at 597-98. However, "[w]idespread acceptance can be an important factor in ruling particular evidence admissible" while a minimally supported technique "may properly be viewed with skepticism." Id.

### iii.   Expert Must be Helpful

The third factor "is typically understood in terms of whether there is a sufficient 'fit' between the expert's testimony and the facts that the jury is being asked to consider." United States v. Schiff, 602 F.3d 152, 172-73 (3d Cir. 2010)(citing Daubert, 509 U.S. at 591). See also In re: TMI Litigation, 193 F.3d 613, 670 (3d Cir. 1999). This factor is about relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (quoting 3 Weinstein & Berger ¶ 702[02], p. 702–18). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591-92.

### b.  Rule 703

Under Federal Rule of Evidence 703, the data underlying the expert's opinion is the central focus. Rule 703 states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

6

FED. R. EVID. 703. The trial court must evaluate whether the data used by an

expert is reasonably relied upon by experts in the field. See In re Paoli RR Yard

PCB Litigation (Paoli II), 35 F.3d 717, 747-49 (3d Cir. 1994).

**II.    Dr. Nelson's Opinions**

Dr. Robert Nelson offers opinions on general causation, pharmacovigilance,

pharmacoepidemiology, drug safety, and drug regulation.[9] Specifically, he addressed the

following questions:

1) whether, and if so, when, there was evidence to make the medical and scientific community generally aware that liver failure might occur with acetaminophen— the active ingredient in Tylenol—ingestion at a level representing less than a massive overdose;

2) whether there was reasonable evidence of an association between liver toxicity and ingestion of acetaminophen at or near four grams per day for therapeutic purposes;

3) what actions a reasonably prudent pharmaceutical company would have taken in assessing and reducing the risks once such evidence became available;  and

4) what McNeil has done over the last half century in relation to liver toxicity and the Tylenol brand and whether these actions were effective risk mitigation by McNeil.

Dr. Nelson offers an overview of the information that was known about the risks

of acetaminophen at the time of the decedent's death, as they relate to hepatotoxicity. He

outlines what a reasonable drug company should have done to reduce these risks (i.e.,

pharmacovigilance), based on his experience. He then explains how the defendants'

actions conformed with that industry standard.

---

[9] Dr. Nelson does not intend to offer a specific causation opinion, with respect to Ms. Hayes.

### III.    Dr. Nelson is Qualified to Offer His Opinions[10]

#### a.  Background and Qualifications

Dr. Robert Nelson is qualified to offer expert testimony in this case. He is a clinical pharmacist by background and initial training. He also has a Masters in Science (Administration in Science and Technology) from George Washington University and a Ph.D. degree in epidemiology from the University of Minnesota.

He received his pharmacy degree in 1974 and completed a residency in Hospital and Clinical Pharmacy. Dr. Nelson then served as the clinical pharmacy liaison to the Neurology Institute at the National Institute of Health (NIH) until 1977, when he transferred to the Food and Drug Administration (FDA)'s Division of Neuropharmacological Drug Products. He continued working at the FDA for more than twenty years.

At the FDA, Dr. Nelson held various positions involving new drug review, epidemiology, and post–marketing surveillance. He was an Associate Director focusing on epidemiology. He also led a project to re-engineer the FDA's post–marketing surveillance program for human drugs, which included a comprehensive revision of the regulations and the construction and implementation of the database for spontaneous adverse event reports (AERs).  Dr. Nelson was responsible for training all professional staff, including all medical reviewers, and was called upon to lecture and oversee the

---

[10] Information about Dr. Nelson's qualifications can be found in Dr. Nelson's curriculum vitae, expert report, and deposition. See Doc. No. 111, Ex. A, Ex. B. See also Wolfe v. McNeil-PPC, Inc., 881 F.Supp.2d 650, 657, 658 (E.D. Pa. 2012)(outlining Nelson's credentials).

development of courses on drug regulation, regulatory science, statistics, clinical trial design, epidemiology, and pharmacokinetics.

Dr. Nelson has authored or co-authored over fifty publications, abstracts, and technical reports. He has presented on numerous occasions about new drug risk assessments, pharmacoepidemiology, regulatory decision-making, dose–response relationships, and good pharmacovigilance practices. He was elected to the initial class of 38 Fellows of the International Society for Pharmacoepidemiology (ISPE). He has also served as an adjunct professor in pharmacoepidemiology at the University of Maryland School of Pharmacy Graduate Program for eight years (2000-08).

Dr. Nelson has since retired and currently serves as a part-time consultant in global drug safety, regulatory safety, drug abuse liability assessments, Good Pharmacovilgance Practices, forensic epidemiology, and regulatory affairs. McNeil itself hired him to consult with the company and assist with its preparation for the 2002 FDA Advisory Committee Meeting concerning the risks of acetaminophen hepatotoxicity.[11]

Dr. Nelson has offered expert testimony in over thirty other cases and has been qualified as a pharmacovigilance and regulatory expert. See, e.g., Wolfe v. McNeil-PPC, Inc., 881 F.Supp.2d 650, 657-60 (E.D. Pa. 2012); Stoddard v. PLIVA USA, Inc., No. 4:08-CV-173-H, 2013 WL 6199268, at *2-5 (E.D.N.C. Nov. 27, 2013). See also "List of Prior Cases" (Doc. No. 111-4, Appendix A).

---

[11] The defendants argue that Dr. Nelson is not qualified to offer an opinion about acetaminophen because he's never worked with acetaminophen products while at the FDA. This argument might hold some weight but for the fact that Dr. Nelson was hired by the defendants as a consultant to prepare for 2002 FDA Advisory Committee Meeting. Given that experience, Dr. Nelson is more than qualified.

Dr. Nelson is qualified to offer his opinions in this case.[12]

### b. Dr. Nelson Does Need to be a Medical Doctor to Offer His Opinions

The defendants claim that Dr. Nelson is not qualified to offer his opinions because he is not a medical doctor, an expert in liver disease, or an expert in pharmacokinetics.[13] Dr. Nelson does not need to be a medical doctor to offer the opinions he proposes.[14] Dr. Nelson is testifying about pharmacovigilance. He is a clinical pharmacist. Dr. Nelson worked for the FDA for more than twenty years on drug regulation, adverse event reporting, and pharmacovigilance/risk reduction matters. Dr. Nelson was hired by McNeil to help prepare for the 2002 FDA Advisory Committee Meeting. He is most certainly qualified to offer his regulatory and causality opinions.[15]

---

[12] See Wolfe v. McNeil-PPC, Inc., 881 F.Supp.2d 650, 657, 658 (E.D. Pa. 2012)(finding Nelson to be qualified regulatory expert); Lofton v. McNeil Consumer & Specialty Pharm., No. 3:05–1531, 2008 WL 4878066, at *9 (N.D.Tex. Jul. 25, 2008)(holding Dr. Nelson qualified to opine regarding drug labeling); Robinson v. McNeil Consumer Healthcare, No. 07–5603, 2009 WL 8636287 (N.D. Ill. Aug. 12, 2009)(order denying a Daubert motion that made the same arguments with respect to Dr. Nelson's qualifications).

[13] The defendants argue that Dr. Nelson's opinions about whether acetaminophen would be approved as a new drug today are speculative and lack foundation. I agree; however, the plaintiff states that Dr. Nelson will not offer such opinions. This argument is moot.

The plaintiff claims that Dr. Nelson may offer opinions related to the monograph system of regulation. From what has been provided, Dr. Nelson is not an expert in this very unique regulatory scheme. He may offer basic facts about the monograph system, in order to provide context, but he is not qualified to offer opinions to help the jury interpret the monograph regulations.

[14] See Decker v. GE Healthcare, Inc., 770 F.3d 378, 393-94 (6th Cir. 2014)("The district court concluded that because Blume was a pharmacovigilance expert, irrespective of whether she was a medical doctor, she was qualified to reliably testify as to the significance of the AERs. Conversely, the district court concluded that because Gaspari was not a pharmacovigilance expert, even though he was a medical doctor, he was not qualified to testify reliably regarding the significance of the AERs. The district court did not abuse its discretion in reaching either conclusion.").

[15] The defendants argue that Dr. Nelson is not qualified to offer opinions about what is required under 21 C.F.R. § 314.81. While at the FDA, he was not specifically responsible for determining compliance for annual reporting nor has he any other experience with annual reporting. However, Dr. Nelson held a leadership role for a post-marketing surveillance project. He trained other FDA employees on pharmacovigilance and other regulatory/compliance

## IV.    Dr. Nelson's Methodology is Reliable

In order to prepare his opinions, Dr. Nelson extensively reviewed the defendants' internal company documents, regulatory filings, medical literature, clinical studies, and epidemiological studies. He also reviewed the available medical literature about acetaminophen toxicity (i.e., case reports, case series, epidemiological analyses, clinical trials, toxicology studies, and pharmacological studies).

### a.  Dr. Nelson's Methodology Does Not Need to Be "Scientific"

The defendants argue that Dr. Nelson's opinions should be excluded as unreliable. They claim that Dr. Nelson's opinions are based on "nothing more than his personal beliefs and commentary." The defendants' argument implies that Dr. Nelson's methods are unreliable because they are not "scientific" or testable. Dr. Nelson is being called to testify as a pharmacovigilance and regulatory expert; this does not preclude his testimony nor require he use "scientific" techniques.[16] Dr. Nelson's reliance on his experience and knowledge in analyzing the available information would be an appropriate methodology for a pharmacovigilance expert.

procedures. This experience qualifies him to offer general regulatory opinions on 21 C.F.R. § 314.81. The defendants' argument goes to weight, not admissibility. Any deficiencies can be explored on cross-examination.

[16] See Betterbox Commcns. Ltd. v. BB Techs., Inc., 300 F.3d 325, 329 (3d Cir. 2002)("[I]n cases not involving scientific testimony, '[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony'…In such cases…'the relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999)). See also Kannankeril, 128 F.3d at 806 ("In order for the expert testimony to be 'reliable,' we have required that the testimony be based on the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'")(citing Paoli, 35 F.3d at 744); Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 784 (3d Cir. 1995)("The reliability requirement, however, should not be applied too strictly."); id. ("If the expert has 'good grounds' for the testimony, the scientific evidence is deemed sufficiently reliable.").

As an FDA regulator, Dr. Nelson would undertake a similar process; he would examine the totality of the evidence to determine whether a risk was "known," the magnitude of that risk, what actions could or should be taken to reduce the risk, and whether the drug company had undertaken risk reduction measures. Dr. Nelson then methodically described in detail how the regulatory framework regarding adverse event reporting was set up to ensure that potential risks were shared with the FDA and the public. Applying his knowledge of the AERs regulations, he then explained how the defendants' actions were not in conformity with these standards, pharmacovigilance practices, and industry standards.

From what has been provided, Dr. Nelson's methods were thorough, and they conformed with practices used by other pharmacovigilance and regulatory experts. The defendants' argument is unpersuasive. See Wolfe v. McNeil-PPC, Inc., 881 F.Supp.2d 650, 660 (E.D. Pa. 2012)(finding Nelson's opinion on regulation, compliance with FDA regulations, and labeling to be reliable).

### b. Dr. Nelson's "Rough Calculations" are Admissible

The defendants take issue with Dr. Nelson's "rough calculations" about how many people may have died or been injured by acetaminophen toxicity, claiming they are unreliable. The defendants mischaracterize the purpose of these "rough calculations." These estimates are meant to analyze whether the known or possible incidence of acetaminophen hepatotoxicity amount to the "safety signal."  These estimates are performed almost daily by the FDA and are consistent with well-known pharmacovigilance principles. Dr. Nelson's analysis on this point is meant to show what

a reasonable drug company would do to carry out pharmacovigilance duties. An article co-authored by Dr. Kenneth Kwong, McNeil's Director of Pharmacovigilance, recognizes this as a method often used to assess risk by drug companies.[17] Guidance from the FDA itself also recommends performing rough estimates in order to assess the risk of an adverse event.[18]

I see nothing inappropriate about Dr. Nelson's calculations given their purpose and the context within which they are used. See Kellogg v. Wyeth, No. 2:07–cv–82, 2012 WL 2970621, at *8 (D.Vt. Jul. 20, 2012)(rejecting similar argument about Dr. Nelson's calculations in another case). Their arguments go to weight, not admissibility. Any flaws in Dr. Nelson's reasoning on this point should be explored on cross-examination.

### c.  Lack of Statistically-Significant Epidemiological Evidence Does not Warrant Exclusion

The defendants claim Dr. Nelson's opinions should be excluded because they are not based on reliable epidemiological evidence.[19] They claim that Dr. Nelson's reliance

---

[17] See J. Wu, et al., "Postmarketing Drug Safety Surveillance: An Overview of Regulatory Issues, Pharm. Dev. Regul., 2003: 1 (4)231-244, 238 (Doc. No. 156, Ex. 2)("In the concept papers for Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, the US FDA stated that risk assessment by the sponsors should comprise an estimate of background rates for the adverse event being investigated. These rates should include an estimate of the background rates in the general population or in a subpopulation with characteristics similar to those of the exposed population. Although the agency recognized that reliable estimates of reporting rates in an exposed population are difficult to obtain, it still suggested that the sponsor should attempt to provide them.").

[18] See FDA/CDER, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiological Assessment, Mar. 2005, at 10 (Doc. No. 11, Ex. F)("If a sponsor determines that a concern about an excess of adverse events or safety signal warrants further investigation and analysis, it is important to put the signal into context. For this reason, calculations of the rate at which new cases of adverse events occur in the product-exposed population (i.e., the incidence rate) are the hallmark of pharmacoepidemiologic risk assessment.").

[19] The defendants also argue that Dr. Nelson's methodology is flawed because he did not look for statistically-significant associations between substance exposure and injury and then apply the Bradford-Hill method—a set of nine guidelines to evaluate scientific data to determine causation. The Bradford-Hill methods, enunciated by Sir Austin Bradford Hill in a 1965 speech before the Royal Society of Medicine, includes a collection of "nine different viewpoints" from which to "study association before we cry causation." Hill, A.B., The Environment and Disease: Association or Causation?, PROC. R. SOC. MED., 58(5):295–99 (May, 1965). These nine guidelines are: 1) the

on "anecdotal case reports," and not controlled epidemiological or "scientific evidence," renders his opinions unreliable—especially since he is an epidemiologist. [20]

---

strength of the association; 2) consistency of the association; 3) specificity or whether there are multiple causes of a condition; 4) the temporal relationship between a condition followed the exposure to the agent; 5) biological gradient or the existence of a dose-response relationship; 6) how plausible the association is biologically; 7) whether the association is "coherent" with (i.e., does not seriously conflict with) generally known facts of the natural history and biology of the disease; 8) does experimentation—removing the causative agent—improve the condition; and 9) analogy. Id. See also In re Seroquel Products Liability Litigation, No. 6:06–md–1769–Orl–22DAB, 2009 WL 3806435, at *5, n. 5 (M.D. Fla. Jun. 23, 2009).

The defendants' interpretation of the type of association needed before using Bradford-Hill is overstated. There is nothing to say that a *statistically-significant* association must be found before applying the methodology. In fact, the whole point of using the Branford-Hill methodology is to test an observational association to show causation. See In re: Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation, --- F.Supp.3d ----, MDL No. 2:14–mn–02502–RMG, 2016 WL 1251828, at *2 (D.S.C. Mar. 30, 2016)("Randomized, double-blind, clinical trials are the 'gold standard' for determining whether an association exists. However, the Reference Manual on Scientific Evidence recognizes that observational studies can be sufficient to establish an association.")(citation omitted); Federal Judicial Center, Reference Manual on Scientific Evidence, at 598-99 (3d ed. 2011)(recognizing that an association is needed first to apply Bradford Hill but not a statistically significant one); id. at 217-18 (recognizing the role of observational studies in establishing causation). If an expert has found a statistically-significant association, there seemingly would be no need to test the association using the Bradford-Hill guidelines.

Dr. Nelson offers observational, epidemiological data to show an association between acetaminophen and hepatotoxicity. He then meticulously applies the Bradford-Hill guidelines to the available epidemiological data. From what has been provided, he appears to use the methodology reliably.

[20] It is true that case reports and anecdotal evidence alone may not be sufficiently reliable for an expert to support a causation opinion. See, e.g., Wade-Greaux v. Whitehall Labs., Inc., 874 F. Supp. 1441, 1483 (D.V.I. 1994) ("…anecdotal human data, whether from published case reports, DERs or other litigation, have inherent biases that make them unreliable."). However, case reports considered in conjunction with other evidence may be an appropriate basis for an expert's opinion on causation. See Wolfe v. McNeil-PPC, Inc., No. 07–348, 2012 WL 38694, at *3 (E.D. Pa. Jan. 9, 2012)("As for the use of AERs as bases for expert testimony, this Court has previously ruled that expert testimony that relies, in part, on case reports to establish causation satisfies the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). See Wolfe v. McNeil–PPC, Inc., No. 07–348, 2011 WL 1673805, at *5 (E.D. Pa. May 4, 2011). The Court reiterates its conclusion that, because plaintiff's experts 'did not solely rely on case reports in forming their opinions on causation but used them to supplement their extensive review' of other evidence, such testimony is admissible."); Wolfe v. McNeil–PPC, Inc., No. 07–348, 2011 WL 1673805, at *5 (E.D. Pa. May 4, 2011)("In this case, the three doctors did not solely rely on case reports in forming their opinions on causation but used them to supplement their extensive review of plaintiff's medical records and deposition testimony of plaintiff's treating physicians. As with defendants' other objections, the three doctors' use of case studies in reaching their conclusion affects only the weight to be given their testimony, not its admissibility. Thus, the proposed testimony of the three doctors is based on sufficiently reliable methods."); Schedin v. Ortho–McNeil–Janssen Pharm., Inc., 808 F.Supp.2d 1125, 1139 (D. Minn. 2011)(explaining that AERs are commonly used by experts to determine causation in conjunction with other evidence), rev'd in part on other grounds, In re Levaquin Prods. Liab. Litig., 700 F.3d 1161 (8th Cir. 2012).

Dr. Nelson does not rely solely on case reports in rendering his opinion. The case reports and case series he does cite also include controls on the information analyzed, which make them more reliable. See Caraker v. Sandoz Pharm. Corp., 172 F.Supp.2d 1046, 1050 (S.D. Ill. 2001)(explaining how "an overwhelming amount" of case reports/series with appropriate controls, analysis of alternative causes, temporal proximity may be a reliable basis for expert opinion"). See also Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 537-44 (W.D. Pa. 2003)(finding case

As the defendants point out in their briefing, no such statistically-significant study on acetaminophen hepatotoxicity exists.[21] As shown by

---

reports to be unreliable and "unscientific" bases for causation opinion because are unpublished, not peer-reviewed, did not consider alternative causes, patients' medical history, etc.); McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1250 (11th Cir. 2005)(explaining that anecdotal information "without any medical controls or scientific assessment" is unreliable basis for expert opinion); Hollander v. Sandoz Pharms. Corp., 289 F.3d 1193, 1211 (10th Cir. 2002)(finding that exclusion of opinions based on case reports with little information about medical history appropriate but that case reports with more detailed information may be reliable source of expert opinion).

In addition, case reports and case series are the types of information on which DILI experts often rely. See FED. R. EVID. 703; Wolfe v. McNeil-PPC, Inc., No. 07–348, 2012 WL 38694, at *3 (E.D. Pa. Jan. 9, 2012); FDA Working Group Report (2008) at p. 11, n. 41 (Doc. No. 154, Ex. 30)(explaining how members of the working group looked at two different databases of case reports/adverse event reports (AERs) in finding that there is a risk of liver injury for some people at 4 grams).

Whether the case reports themselves may be admissible or disclosed to the jury is a separate question, which I will defer until I see how they may be used at trial. See FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."); Wolfe v. McNeil-PPC, Inc., No. 07–348, 2012 WL 38694, at *3 (E.D. Pa. Jan. 9, 2012).

As explained above, epidemiological or case-controlled studies for acetaminophen-induced liver injuries are not available. In the absence of epidemiological data, case reports and case series serve as valuable sources of information for DILI experts, doctors, and scientists in determining causation. See, e.g., N. Kaplowitz Dep., Jun. 3, 2014 at 134-136, 139, 158, 194, 213 (Doc. No. 154, Ex. 9)(Lyles Deposition); Davern, T.J., et al., Drug-Induced Liver Injury in Clinical Trials: As Rare as Hen's Teeth (editorial), Am. J. Gastroenterol., 2009: 104: 1159-1161 (Doc. No. 154, Ex. 8)(explaining how multi-center reporting is important to understanding DILI); FDA Working Group Report (2008) at 3-5, 11, n. 41 (Doc. No. 154, Ex. 30).

[21] See Stoddard v. PLIVA USA, Inc., No. 4:08-CV-173-H, 2013 WL 6199268, at *2-5 (E.D.N.C. Nov. 27, 2013)("[T]he fact that no study exists regarding the incidence of tardive dyskinesia in diabetics does not render incompetent Dr. Nelson's opinion concerning the incidence and development of tardive dyskinesia in the general population. The court finds no basis for PLIVA's claim that general causation requires a showing that metoclopramide is capable of causing tardive dyskinesia in the particular sub-population of which Stoddard is a member. Additionally, Dr. Nelson's epidemiological opinions appear to rest on the same principles and methodologies utilized by the FDA. Any challenge to the soundness of Dr. Nelson's opinion that the incidence of metoclopramide-induced tardive dyskinesia is greater than indicated on the drug label go to the weight, not the admissibility of the testimony.").

I note that the way acetaminophen has been regulated—having been on the market, grandfathered in under the monograph system, and never issued a final monograph—may also explain why this type of research has never been conducted. See In re Tylenol (Acetaminophen) Marketing, Sales Practice, and Products Liability Litigation, MDL NO. 2436, 2015 WL 7075949, at *7-9 (E.D. Pa. Nov. 13, 2015)(decision on motion for summary judgment explaining regulatory framework). Unlike other drugs, pre-marketing research was not conducted on acetaminophen. While acetaminophen manufacturers are encouraged to perform research to determine acetaminophen's potential adverse events, they are not necessarily required to perform post-marketing research by regulation. See 21 C.F.R. § 330.12(c)(explaining how manufacturers of drugs with a Tentative Final Monograph are "encouraged to perform

testimony from Dr. Anthony Temple, former Vice President of Medical Affairs at

McNeil, the nature of acetaminophen hepatotoxicity and the ethical obligations of

drug researchers make such a study almost impossible to conduct.[22]

I find the defendants' argument unpersuasive. While epidemiological studies can

be valuable evidence of causation, they are not a pre-requisite for product liability

causation expert testimony.[23] Dr. Nelson cites over two hundred sources to support his

---

studies to obtain adequate evidence of effectiveness" and make appropriate changes in labels and formulations "to bring the products into conformity with current medical knowledge and experience").

[22] See A. Temple Dep., Mar. 20, 2014 at 91 (Doc. No. 154, Ex. 10)(under seal)("I don't think there was an easy way or even a way to look retrospectively. I mean, we just did another case series with -- he admitted that it's very hard to define ingestion of alcohol or fasting during this period of time. So his case series was what it was. So doing the kind of epidemiology series I think you're describing, we determined wasn't a feasible study, but we have evaluated whether to do that or not, yes."), at 100 ("[W]e talked -- we had talked with epidemiologists, and we had looked at that issue, and I don't know that they -- I don't recall them ever giving us an adequate proposal, but the answer is yes, we did talk to them about the dosing issues and about ways to conduct epidemiology studies."), and at 185-86 ("McNeil has not done an epidemiology study that way because we couldn't find a way to conduct that trial."); Davern, T.J., et al, Drug-Induced Liver Injury in Clinical Trials: As Rare as Hen's Teeth (editorial), Am. J. Gastroenterol., 2009: 104: 1159-1161 (Doc. No. 154, Ex. 8); N. Kaplowitz Dep., Jun. 3, 2014 at 139, 164, 214-15 (Doc. No. 154, Ex. 9)(Lyles Deposition) and at 139 ("I mean, there's no -- first of all, there is no scientific evidence that it does not because the studies are not powered to exclude it. And so, as one always has to do in the setting of rare events, is you have to see an accumulation of rare events. If this happened once in history, you know, one case report in the world's literature, obviously -- or two, even -- we wouldn't be sitting here. But there are -- there's enough smoke here, enough case reports, coupled with all the other things that I've just been talking about that I won't repeat that I don't agree with."). See also S. Flamm Dep., May 5, 2015 at 94, 98 (Doc. No. 154, Ex. 4)(admitting that he cannot name one hepatotoxic drug which has statistically significant proof to show liver injury causation); R. Brown Dep., Apr. 30, 2015 at 105-09 (Doc. No. 154, Ex. 3)(same); A. Temple Dep., Mar. 20, 2014 at 84-85 (Doc. No. 154, Ex. 10)("Q. And because it would be inappropriate and unethical to prospectively expose a patient to a drug with the intent of trying to measure harm? A. Well, yeah. That's been an issue with giving overdoses of acetaminophen, yes. You  wouldn't do it -- if you knew that giving a drug in a certain dose produced harm, then you wouldn't want to give it to someone.").

[23] See Wolfe v. McNeil-PPC, Inc., No. 07–348, 2011 WL 1673805, at *15 (E.D. Pa. May 4, 2011)(rejecting similar argument from McNeil in Motrin products liability action); Lanzilotti by Lanzilotti v. Merrell Dow Pharmaceuticals Inc., No. 82–0183, 1986 WL 7832, at *2 (E.D. Pa. Jul. 10, 1986)("We note also that it has not been declared in this circuit that epidemiological studies are an indispensable element in the presentation of a prima facie drug product liability case, or that such studies must be the sole basis for expert opinion."); Mazur v. Merck & Co., Inc., 742 F.Supp. 239, 264 (E.D. Pa. 1990)(same); Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1384 (4th Cir. 1995)("[W]e do not read Daubert as restricting expert testimony to opinions that are based solely upon epidemiological data. Daubert merely requires that the expert testimony be both relevant and reliable; and Daubert clearly vests the district courts with discretion to determine the admissibility of expert testimony. Under the Daubert standard, epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound."). See also Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 449 (W.D. Pa. 2003)(discussing the value of epidemiological studies).

opinions.[24] I see nothing wrong with the reliability of the sources upon which he relies.

Any weaknesses in his analysis or citations can be explored on cross-examination. The

defendants' argument goes to weight, not admissibility.[25]

## V.    Dr. Nelson's Opinions Would be Helpful to the Jury

### a.  Dr. Nelson's Opinions on Compliance are not Legal Conclusions

The defendants also argue that Dr. Nelson's opinions are inadmissible as legal

conclusions.[26] An expert cannot usurp the role of the judge or jury. See, e.g., Berckeley

---

[24] Among these references, Dr. Nelson cites Larson, A.M., et al., Acetaminophen-induced acute liver failure: results of a United States multicenter, prospective study, Hepatology, 2005 Dec.: 42(6): 1364-1372 (Doc. No. 154, Ex. 22). The defendants filed a separate motion to exclude the use of this article. See Motion to Exclude Opinion Testimony of Robert Nelson based on Supplemental Data, Jan. 29, 2016 (Doc. No. 193). I denied that motion. See Memorandum and Order Denying Defendants' Motion to Exclude Plaintiff's Expert Testimony Based on Larson Article/ALFSG Data, Jul. 14, 2016 (Doc. No. 224, 225). I see nothing improper with how Dr. Nelson has used the Larson article—along with other evidence—in rendering his opinion.

[25] See Wolfe v. McNeil-PPC, Inc., 881 F.Supp.2d 650, 660-61 (E.D. Pa. 2012)(rejecting similar arguments by the defendants in an analogous case); Davids v. Novartis Pharms. Corp., 857 F. Supp. 2d 267, 278 (E.D.N.Y. 2012)("Novartis' objections to expert opinions on the grounds that they are unreliable because they rely on non-controlled epidemiologic studies or extrapolate opinions from articles based on different cancer types than those of Mrs. Deutsch and Mr. Napolitano will not affect the admissibility of such opinions. The weight of a conclusion derived from these studies involves the resolution of a factual dispute and therefore is a classic question for the jury."); Lofton v. McNeil Consumer & Specialty Pharmaceuticals, No. 3:05-CV-1531-L (BH), 2008 WL 4878066, at *4-5 (N.D. Tex. Jul. 25, 2008)(explaining how similar argument about evidence relied upon goes to weight not admissibility).

The defense experts admit that having case-controlled epidemiological data is not a requirement in finding causation for drug-injured liver injuries. See R. Brown Dep., Apr. 30, 2015 at 106-07 (Doc. No. 154, Ex. 3)("Q. My question is very specific, sir. My question is, is there a requirement in any of the peer-reviewed medical literature that before a drug can be ruled in as a potential hepatotoxic drug that there must be a case-controlled epidemiologic study?…A. The answer is, you have to have some data. What form that data takes varies, based upon the drug you're studying and what you're trying to assess. You have to have reliable data. And that reliable data can come from a number of sources. If you have randomized controlled clinical trial data, you don't have need much else. If you're requiring lower -- the way we grade data is you have a quality of the data and a confidence in the data, and then you come up with a strength of the recommendation. And that's a -- that was not a standard process in 1990 and 2000 when many of these articles were done, but it is the standard now. And so the higher the quality of the evidence, the fewer studies you need. The lower the quality of the evidence, the -- either you need stronger data or more research.") and at 107-109;  S. Flamm Dep., May 5, 2015 at 97 (Doc. No. 154, Ex. 4)("Q. Okay. And there is no requirement in the causation algorithm that there be an epidemiologic study that would demonstrate a statistically significant 2.0 relative risk to a P-value of .05 standard epidemiologic association  in order to rule in a drug as a potential cause for acute liver failure or DILI. True? A. Yes. Again, it's not a requirement, but for you to make a very good clinical decision and really understand an interaction with a particular patient and a product, you have to have some level of comfort in the data that are behind it.") and at 98.

Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006). "Notwithstanding this admonition, the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." Id. at 218. I agree that Dr. Nelson cannot opine that the defendants breached their legal duties, offer an opinion about what the defendants' intent was, or offer testimony about internal documents which the jury themselves can easily interpret on their own.[27]

Dr. Nelson can, however, offer testimony on what certain technical regulatory documents mean and how they exemplify compliance with industry standards/customs.[28]

---

[26] On this point, the defendants also make a Rule 403 argument, claiming that expert testimony about the defendants' compliance with FDA regulations would be irrelevant and/or confusing to the jury. I see nothing warranting outright exclusion of Dr. Nelson's regulatory opinions under Rule 403. However, the defendants may make an objection based on Rule 403 at trial, if appropriate.

[27] See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony. As the Diet Drugs court stated in excluding testimony that the pharmaceutical defendant's conduct with respect to labeling was motivated by its desire to increase profits, '[t]he question of intent is a classic jury question and not one for the experts.'")(quoting In re Diet Drugs, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. Jun. 20, 2000)); Heineman v. American Home Products Corp., No. 13–cv–02070–MSK–CBS, 2015 WL 1186777, at *12 (D. Colo. Mar. 12, 2015)(excluding Dr. Blume's opinions about defendants' state of mind; In re Viagra Prods. Liab. Litig., 658 F. Supp. 2d 950, 964-965 (D. Minn. 2009)("There is no indication in the record that the jury here would require special assistance to interpret the documents on which Dr. Blume bases her opinion that Pfizer was more worried about bad publicity than safety. Because the jury is equally capable of evaluating this particular evidence, Dr. Blume's opinion on this matter must be excluded."); Chandler v. Greenstone Ltd., No. C04–1300RSL, 2012 WL 882756, at *1 (W.D. Wash. Mar. 14, 2012)(excluding Dr. Blume's opinions on defendants' state of mind, intent, or knowledge); Johnson v. Wyeth LLC, No. CV 10–02690–PHX–FJM, 2012 WL 1204081, at *3 (D. Ariz. Apr. 11, 2012)(excluding Dr. Blume's opinions on defendants' motive, intent, knowledge, or other state of mind); In re Baycol Prods. Litig., 532 F. Supp. 2d 1029, 1067 (D. Minn. 2007)("The Court finds that Dr. Smith's opinion criticizing Bayer for inadequately evaluating the potential toxicity of Baycol, and asserting that Bayer ignored warnings is legal argument that does not qualify as expert testimony under Rule 702."); Tyree v. Boston Scientific Corp., 54 F. Supp. 3d 501, 564 (S.D. W.Va. 2014)("While internal corporate documents and executives' testimony are certainly relevant in this case, such evidence 'should be presented directly to the jury, not through an expert.'" (quoting In re C.R. Bard, Inc., 948 F.Supp.2d 589, 628 (S.D. W.V. 2013)).

[28] See Heineman v. American Home Products Corp., No. 13–cv–02070–MSK–CBS, 2015 WL 1186777, at *12 (D. Colo. Mar. 12, 2015)("[I]t may be necessary for Dr. Blume to explain the meaning or significance of certain words or concepts that might appear in such records—she may have to explain what a safety surveillance employee does, the hierarchy that oversees such employees, or the typical consequences of the event the record reflects—but the Plaintiffs have not shown that, armed with such records and Dr. Blume's explanations thereof, the trier of fact would

"The FDA drug approval process, FDA regulations, and protocols of drug labeling are topics that are likely unfamiliar to a layperson, and expert testimony on these topics will be helpful to the jury's understanding of the complex issues in this case." Johnson v. Wyeth LLC, No. CV 10–02690–PHX–FJM, 2012 WL 1204081, at *3 (D. Ariz. Apr. 11, 2012). See also Wolfe v. McNeil-PPC, Inc., 881 F.Supp.2d 650, 660 (E.D. Pa. 2012)(finding Nelson's opinion to be helpful to the jury because "[m]any of the regulation-related documents in this case are complicated and confusing to a person lacking a background in science or medicine"). This testimony will aid the jury in determining whether the defendants fell below that industry standard and to what extent the defendants knew or should have known about the risk of liver damage.

As the Third Circuit noted, an expert's testimony in explaining industry standards may come close to the line of what is acceptable. I see nothing in Dr. Nelson's proffered testimony that warrants outright exclusion on these topics. However, I expect that his testimony will remain within the scope of his role as a pharmacovigilance and regulatory expert.

---

be unable to reach a conclusion about the Defendants' knowledge of any labeling deficiencies without Dr. Blume's say-so."); In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 192 (S.D. N.Y. 2009)("Dr. Parisian's commentary on any documents and exhibits in evidence will be limited to explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge. She will not be permitted to merely read, selectively quote from, or 'regurgitate' the evidence."); Wright v. American Home Products Corp., 557 F. Supp. 2d 1032, 1038 (W.D. Mo. 2008)("Blume is clearly qualified to testify about the risks and benefits of Pondimin as it relates to general industry practice and she is qualified as to any general industry standards Wyeth followed or failed to follow prior to marketing and distributing Pondimin."); Fraser v. Wyeth, No. 3:04cv1373, 2014 WL 129172, *5 (D. Conn. Jan. 4, 2014)("Dr. Blume, based on her extensive experience, testified as to the industry standard of pharmacovigilance (see Trial Tr. Vol. II at 202–03), and opined that Wyeth had violated that standard with respect to the Prempro label (see, e.g., id. at 737–38 (testifying that the failure to include information regarding the risk of dying from breast cancer in the Prempro label violated the duties of pharmacovigilance and the FDA regulations)).").

### b.  Dr. Nelson's Challenged Opinions are Taken Out of Context[29]

The defendants argue that Dr. Nelson's opinions are "broad and vague,"
making them "useless" to the jury. The sentences with which the defendants take
issue are in the "conclusions" section of Dr. Nelson's report.[30]  Of course these
statements would be broad; they are meant to offer the larger points of his opinion.
Before reaching those conclusions, Dr. Nelson offers 100+ pages outlining the
basis for his opinions.

### c.  Dr. Nelson's "Public Health" Opinions are Relevant

The defendants argue the Dr. Nelson's opinions related to "public health"
are irrelevant or highly prejudicial. They claim that the defendants owe no duty to
the public, only the plaintiff and decedent, and to indicate otherwise could be
confusing to the jury. The plaintiff responds that duties to the public are relevant
because Ms. Hayes was a member of the public. Any duties owed to the
consumers generally would also have been owed to Ms. Hayes. This is a fair point.

In addition, the plaintiff points out that FDA documents about
acetaminophen hepatotoxicity have noted it as a "public health problem." Dr.
Nelson's discussing it as such would be relevant to provide background for his

---

[29] The defendants also argue that Dr. Nelson's opinions would be confusing to the jury because he talks about liver injury generally, not acute liver failure (ALF). Acute liver failure is only a small subset of liver injury. However, I see no reason why this could not be explained to the jury. I see nothing confusing about Dr. Nelson's opinions warranting outright exclusion.

[30] See R. Nelson Expert Report, May 2, 2014 at 117-20 (Doc. No. 111, Ex. A).

opinions. Lastly, the plaintiff explains that examining the "public health impact"

of a drug is a part of good pharmacovigilance practices.[31]

I see nothing inappropriate about Dr. Nelson's discussing of public health.

The defendants' arguments go to weight, not admissibility.

### III.   Dr. Nelson's Opinions are Not Preempted under **Buckman**

The defendants argue that Dr. Nelson's opinions are preempted by Buckman Co.

v. Plaintiffs' Legal Comm., 531 U.S. 341 (2001). Specifically, they point to a footnote in

Buckman stating: "The FDCA leaves no doubt that it is the Federal Government rather

than private litigants who are authorized to file suit for noncompliance with the medical

device provisions: '[A]ll such proceedings for the enforcement, or to restrain violations,

of this chapter shall be by and in the name of the United States.' 21 U.S.C. § 337(a)."

Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 349 n. 4 (2001).

Buckman preempts "fraud on the FDA" claims, not evidence.[32] I previously ruled

that the plaintiff's fraud-based claims are not preempted by Buckman.[33] I also ruled, in a

related motion in limine, that Buckman does not exclude evidence of the defendants'

communications with the FDA because the plaintiff's claims do not rest solely on

---

[31] Dr. Kwong's article also acknowledged this. See J. Wu, et al., "Postmarketing Drug Safety Surveillance: An Overview of Regulatory Issues, Pharm. Dev. Regul., 2003: 1 (4)231-244, 234 (Doc. No. 156, Ex. 2)("Initial noncompliance is judged on a case-by-case basis with public health impact considered.").

[32] See, e.g., In re Trasylol Products Liability Litigation, 763 F.Supp.2d 1312, 1329 (S.D. Fla. 2010)("Buckman and its progeny deal with the preemption of claims, not evidence. Therefore, the Court must decide whether testimony or evidence that Bayer failed to adequately or timely provide information to the FDA is relevant to Plaintiffs' state-law claims rather than to a fraud-on-the-FDA claim that would be preempted by Buckman. In other words, Buckman informs the relevance analysis.").

[33] See In re: Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation, MDL NO. 2436, No. 2:12-cv-07263, 2015 WL 7076012 (E.D. Pa. Nov. 13, 2015).

violations of FDA regulations.[34] Dr. Nelson's opinions are intended to provide the jury with the scope of the defendants' duties based on FDA and industry standards. This information would be relevant to the plaintiff's failure-to-warn, design defect, and punitive damages claims. Under Buckman, I see nothing improper about Dr. Nelson offering opinions about what was expected of the defendants.[35]

## IV.   CONCLUSION

For the foregoing reasons, I will **DENY** the defendants' motion to exclude Dr. Nelson's testimony under Daubert.[36]

An appropriate order follows.[37]

---

[34] See In re: Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation, MDL NO. 2436, No. 2:12-cv-07263, 2016 WL 1569719, at *5-7 (E.D. Pa. Apr. 19, 2016). See also Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 352-53 (2001)(distinguishing Buckman-type claims from traditional common law, state law tort claims); In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Products Liab. Litig., 3:09-MD-02100-DRH, 2011 WL 6302287, at *27 (S.D. Ill. Dec. 16, 2011)("Buckman does not pre-empt evidence of when Bayer informed the FDA of information relating to Yasmin and YAZ. Buckman is a claim preemption case focusing on fraud-on-the-FDA claims, not an evidence preemption case….The Supreme Court made clear in Wyeth that federal law does not prevent judges and juries in failure to warn cases from considering a drug companies compliance with FDA regulations. Wyeth, 555 U.S. at 568–73."); In re Medtronic, Inc., Implantable Defibrillators Litigation, 465 F.Supp.2d 886, 900 (D. Minn. 2006)("Thus, plaintiffs may use evidence—if they are able to produce it—of Medtronic's efforts to manipulate the regulatory process in order to prove their negligence and strict liability claims, but they may not bring an independent claim for relief based on fraud-on-the-FDA.").

[35] The duty at issue here is distinct from that which was discussed in In re Trasylol Products Liability Litigation, 763 F.Supp.2d 1312, 1329 (S.D. Fla. 2010)—a case the defendants cite to support their Buckman argument. Trasylol excluded evidence that the defendant pharmaceutical company failed to disclose information required by FDA regulation as irrelevant and/or prohibited under Buckman. Id. at 1329-30. Trasylol's concern was that a negligence claim premised solely on non-disclosure to the FDA would be controverted into a "fraud-on-the-FDA" claim. No such concern is found in this case.

[36] Any other arguments by the defendants not specifically discussed go to the weight, not the admissibility, of Dr. Nelson's testimony.

[37] Dr. Nelson's opinions are expected to conform to my previous rulings regarding summary judgment, motions in limine, and relevant topics discussed in other Daubert motions (i.e., whether acetaminophen is considered GRASE).